# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.
 DANIEL MAKIEL,
        Petitioner,

          v.

MICHAEL P. ATCHISON, Warden,
 Menard Correctional Center,
        Defendant.

No. 12 CV 9644
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

This is a petition for a writ of habeas corpus filed by a state prisoner convicted of first degree murder and armed robbery by a court and jury in the Circuit Court of Cook County. Petitioner stands to spend the rest of his life in a prison. The factual findings of the state court are not contested by petitioner. The arguments and points raised in petitioner's briefs are legal, not factual. In any event, the state court's fact findings can be defeated only by clear and convincing evidence rebutting them. 28 U.S.C. § 2254 (e)(1).

The Illinois Appellate Court's lengthy statement of facts is incorporated in this opinion in verbatim form and represents the state court findings of fact.

### The Facts of the Case

Daniel Makiel [petitioner] was indicted on April 7, 1989, for the murder and armed robbery of Katherine Hoch, which occurred on October 19, 1988, at the Mobil gasoline station she managed in Calumet City, Illinois. On October 20, 1989, police executed a warrant for Makiel's arrest at the Indiana Department of Corrections. Indiana extradited Makiel, and Illinois authorities transported him to

Cook County. A jury later found Makiel guilty of first degree murder and armed robbery, and he was sentenced to a term of natural life in prison for the murder, consecutive to an extended term of 60 years' imprisonment for the armed robbery, both sentences to be consecutive to a 40 year sentence for attempted murder in Indiana.

* * *

At trial, Todd Hlinko testified that in October 1988, he lived with [petitioner] at [petitioner]'s father's house in Calumet City. On October 19, 1988, he and [petitioner] had possession of a blue Oldsmobile Cutlass 442 owned by their friend, John Miller, who had loaned the car to [petitioner] for transmission repair work. The Cutlass was a distinctive shade of blue, with wide, white striping emblazoned with "442" across the side panels. In later testimony, John Miller stated that he had loaned the car to Hlinko and [petitioner] on October 19, 1988, and noticed from its condition the next day that the car had been driven overnight.

Hlinko testified that he and [petitioner] used the Cutlass to pick up Sammy Ilich from work at about 5 p.m. on October 19, 1988. [Petitioner] drove, Hlinko sat in the passenger seat, and Ilich sat in the back. They drove around Dolton and Calumet City, looking unsuccessfully for parties or somewhere to sell marijuana. They stopped at [petitioner]'s house to use the telephone at 7 p.m. At about 7:30 p.m., they drove to the Harrison Park area of Hammond, Indiana, where [petitioner] got out of the car and went up to "some guy's house." When [petitioner] returned to the car, he gave Ilich a "hit" of acid and took some

himself. Although Hlinko said that he did not take acid that night, he had used it before.

They drove toward Calumet City, stopping to play pool and still trying to sell marijuana. At approximately 11 p.m., [petitioner] said he "would stop and get some money." They pulled into the Mobil gasoline station at Burnham and Michigan City Roads in Calumet City, parking the Cutlass just off Michigan City Road. They waited in the car for a few minutes, listening to music, until two customers who were in the station left. Then they pulled the car next to a white van, which was parked parallel to the east side of the station. In later testimony, Hoch's husband identified the white van as the vehicle Hoch drove to work that day.

Hlinko followed [petitioner] out of the Cutlass and into the station. As they entered, Hlinko saw Hoch walking from the counter in the mini-mart, towards the back room. [Petitioner] told him to "watch out," pointed a gun at Hoch, grabbed her arm, and led her into the back room. As he acted as lookout, Hlinko heard [petitioner] demand money from Hoch, heard noises like drawers slamming, and heard a single gunshot. [Petitioner] then exited the back room, holding the gun and a purse, and went behind the counter to the cash register. [Petitioner] picked up an envelope from the cash register and took two packs of cigarettes and handed them to Hlinko. Hlinko saw no one else in the station at the time, and estimated that only a few minutes elapsed while they were inside.

When they returned to the car, [petitioner] put the purse under the driver's seat. Although he guessed what had happened in the station, Hlinko kept asking

[petitioner] "what the hell was going on." [Petitioner] responded, "Don't worry about it." As he drove, [petitioner] told Hlinko that "something went wrong" at the station. Ilich asked to go to his home in East Chicago, but as they neared his house Ilich changed his mind and they headed instead to the house of Shane Miller (no relation to John Miller), also in East Chicago. En route, they stopped in an alley near Ilich's house, and [petitioner] left the car with the purse and walked to a dumpster. Hlinko did not see what [petitioner] did there, but noticed that [petitioner] returned to the car without the purse.

At about 11:30 p.m., Shane invited Hlinko, Ilich, and [petitioner] into his house, and the four of them smoked a marijuana cigarette. About five minutes later, all four drove in the Cutlass to the Calumet Expressway, with Shane and Ilich in the back seat. [Petitioner], who was driving, slowed the car down and took the gun from his pants as they crossed the bridge near Calumet City. He handed the gun to Hlinko, and told him to get rid of it. Hlinko threw the gun out the passenger window and into the Cal-Sag River. Shane asked what Hlinko threw out the window, and Hlinko answered that it was a gun.

They then returned to the same Calumet City Mobil station, arguing about who would get out and pump the gasoline. They saw squad cars in the parking lot, and a police officer stopped their car at the entrance, telling them that something had happened and that they would have to leave.

They drove from the station to [petitioner]'s house, arriving around midnight. Hlinko and [petitioner] went upstairs to [petitioner]'s bedroom, while Ilich and Shane used the downstairs bathroom.

During the moments before Ilich and Shane entered the bedroom, Hlinko again asked [petitioner] what happened, and [petitioner] again told him not to worry, and that something went wrong. After Ilich and Shane entered the room, Hlinko heard [petitioner] tell Shane about the killing. The four then drank alcohol and smoked marijuana.

At about 1 a.m., John Pullyblank and his girlfriend arrived at [petitioner]'s house, but no one said anything to them about the killing. When the two newcomers offered to go out and buy more alcohol, [petitioner] contributed $20 for himself, Ilich, and Hlinko. Hlinko testified that the $20 surprised him because [petitioner] usually had no money and Hlinko had paid for everything earlier that evening. In later testimony, Pullyblank said that he was friends with Ilich, Hlinko, and [petitioner], but denied seeing Shane while visiting [petitioner]'s house; he also did not know for certain whether he visited [petitioner]'s house on the night in question.

Hlinko further testified that, after the night of October 19, 1988, [petitioner] next spoke to him about the killing upon returning from the police station, where the police had questioned him about an unrelated purse snatching. [Petitioner] told him not to worry about the killing because they "got away with it", and because the police showed more interest in the purse snatching than in the killing.

On March 2, 1989, the police arrested Hlinko on a drug offense which also violated his probation. While in custody on March 2, 1989, Hlinko signed a statement in which he stated that on October 19, 1988, [petitioner] went into the

Mobil station alone, and that he, [petitioner], and Ilich drove to [petitioner]'s house directly from the station. In the statement, he said he saw a purse at [petitioner]'s house when he and [petitioner] went to sleep on October 19, 1988.

The police arrested Hlinko again on March 16, 1989, this time for the armed robbery and murder at the Mobil station. Hlinko testified that he initially confirmed the truthfulness of his March 2 statement. He told the police on March 16 about [petitioner]'s statements to him after [petitioner]'s interrogation regarding the purse snatching. He might have told the police that [petitioner] and others left the house at around 11 p.m. on October 19, 1988, to buy cigarettes at the Mobil station. Hlinko eventually signed a statement for the police on March 16, 1989, which differed from the March 2 statement. In the March 16 statement, he again placed himself, Ilich, and [petitioner] at the station, but said that he stayed in the car while [petitioner] and Ilich went inside. He told the police on March 16 that he saw [petitioner] throw things out of the car window on October 19, 1988, but did not see a gun.

Hlinko testified that he lied to the police at first about not going into the gas station in an attempt to avoid implicating himself. He felt great pressure on March 16 and signed the statement because the police told his parents he should cooperate or be charged with the murder. He later filed charges of police brutality, alleging that the police beat him in order to obtain his statement. In April 1989, he told his mother, his attorney, and [petitioner] that the police beat him. He said, however that he had lied about the police brutality in order to discredit his prior statements and to protect his friends.

Beginning in March 1989, Hlinko, Ilich, and [petitioner] were in jail together on the murder charges. Hlinko testified that during that time, [petitioner] persuaded him to sign an affidavit which [petitioner] dictated and which disclaimed all of his previous statements. The affidavit claimed falsely that he had never seen [petitioner] with a firearm, and that [petitioner] had no involvement in an armed robbery or a murder. The affidavit contained nothing about their having gone to Shane Miller's house on October 19, 1988, but instead stated that [petitioner] had babysat at his sister's house that night. Hlinko did not read the affidavit before signing it; [petitioner] took it away as soon as he signed it and later gave him a copy. Describing the babysitting alibi as impossible and untrue, Hlinko testified that his lawyer told him he should not have signed the affidavit.

Hlinko further testified that in October 1990, he entered a plea agreement with the State's Attorney's office. The State's Attorney dropped the armed robbery and murder charges, and agreed to recommend a five-year sentence for the March 2, 1989 drug offense, to run concurrently with the sentence for his violation of probation. In exchange, Hlinko agreed to testify truthfully about the events of October 19, 1988. Hlinko rejected an earlier plea offer out of loyalty to [petitioner]. He entered into the October 1990 agreement because he did not want to go to prison for a shooting that [petitioner] committed. He enjoyed no special treatment or better living conditions in prison because of the agreement. Hlinko denied telling Ilich's mother on October 29, 1990, that he intended to lie to the State's Attorney in order to save his own life. Finally, Hlinko testified that the

assistant state's attorneys never told him what to say, and that he signed a statement confirming the truth of his anticipated trial testimony.

Shane Miller testified that he had seen [petitioner] hand something to Hlinko while in the Cutlass on the Calumet Expressway, telling him to get rid of it. He saw Hlinko throw it out of the window into the Cal-Sag River, and when he asked Hlinko what it was, Hlinko told him it was a gun.

Shane stated that the four men stayed at [petitioner]'s house for about 25 minutes, during which time [petitioner] told Shane that he, Ilich, and Hlinko had gone to the gas station, and that he had shot the woman manager. Brian Spodach dropped by and gave Shane a ride to Shane's sister's house. Shane said nothing to either his sister or Spodach about the conversation with [petitioner]. Spodach later testified that he neither went to [petitioner]'s house nor gave Shane a ride on October 19, 1988. He heard about the Mobil station murder two weeks after it occurred, and at that time deliberately told himself he was not with Shane on the date in question. Spodach admitted that he did not want to testify, but denied telling anyone that if called he would say that he knew nothing about the suspects.

Shane also testified that he did not want to testify, and told this to [petitioner]'s lawyers and to Hlinko's mother. He read about the killing in the newspapers but did not go to the police with information until March 1989, when he testified before a grand jury. On March 15, 1989, he signed a statement for the police detailing the October 19, 1988 conversation in [petitioner]'s bedroom. The police did not threaten him. He had spoken with Hlinko's mother 15 to 20 times after Hlinko was charged with the murder in March 1989. On February 20, 1990,

Hlinko's mother came to his house and persuaded him to sign a statement she had written. Shane denied writing in the February statement that the police forced him to make his statement the previous March by threatening to charge him with withholding evidence and involvement in the murder. Hlinko's mother wrote the February 1990 statement in order "to get her son out of jail." He denied ever reading the statement in its entirety. Knowing it was untrue, Shane signed it anyway, because Hlinko's mother cried and begged him to do so.

Ilich, who had been acquitted of the murder and armed robbery charges in a previous jury trial, did not testify.

Assistant State's Attorney Patrick Quinn testified that on March 21, 1989, in the presence of police investigators, after reading [petitioner] his *Miranda* rights he interviewed [petitioner], who was in custody in Indiana after being convicted of attempted murder. [Petitioner] told Quinn that his sister, Laura Kobak, had visited him earlier that day and warned him to expect a visit from state investigators. [Petitioner] denied knowing anything about the murder, or what he did on October 19, 1988. When Quinn prompted [petitioner] with information already given by Hlinko and John Miller concerning that day, [petitioner] said that he remembered. [Petitioner] told Quinn that he and Hlinko dropped John Miller off at his workplace, drove around in John's car, and kept the car with the intention of fixing it. He told Quinn that they quite possibly went to the Mobil station to buy cigarettes. [Petitioner] later told Quinn that when they stopped at the station, Ilich was not with them.

Quinn informed [petitioner] that a witness had seen Ilich with him and Hlinko at the Mobil station at or about the time of the murder. At this point [petitioner] sat up straight, opened his eyes widely, and said he suddenly remembered that Ilich had joined them that night when they stopped at the Mobil station. He told Quinn that he remembered no details of the gas station stop because he drank alcohol all day, smoked marijuana with Hlinko, and dropped acid. [Petitioner] called Ilich and Hlinko his partners, and said that Ilich and Hlinko could not have gone into the station and murdered Hoch without his knowledge.

Quinn testified that he next interviewed [petitioner] on October 20, 1989, after [petitioner] was extradited, while transporting him to Illinois. Quinn read [petitioner] his rights, and [petitioner] again indicated that he understood his rights and agreed to talk. [Petitioner] told Quinn that since the previous interview, [petitioner]'s sister had informed him that her birthday fell on October 19. After speaking with his sister, [petitioner] remembered that on her birthday in 1988, he and Hlinko attended the sister's birthday party in Indiana. He said that John Pullyblank and Ilich did not attend the party. [Petitioner] told Quinn that they arrived at his sister's birthday party in the early evening, and returned to Chicago at around 11 p.m. [Petitioner] said that he burned up the transmission in John Miller's car and had it towed.

Allen Martin testified that at about 11 p.m. on October 19, 1988, he and his girlfriend stopped at the Mobil station to buy gasoline. He recognized John Miller's distinctively-painted Cutlass parked along the fence on the east side of

the station. He saw his friends — [petitioner], Hlinko, and Ilich — sitting in the Cutlass. After he paid for his gasoline, he waved to the three men still sitting in the Cutlass, got into his car, and drove to a gameroom. He estimated that he stayed at the Mobil station a total of 3 minutes and at the gameroom for 20 minutes before he left to drive his girlfriend home.

On the way to his girlfriend's house, Martin passed the Mobil station and saw an ambulance and squad cars. He read about the Mobil station murder in the newspaper, and later read about [petitioner]'s, Hlinko's, and Ilich's implication in the crime. It took him a while to make a connection between his having seen his friends at the station on October 19 and their possible involvement in the murder.

Martin further testified that he remembered talking to a public defender on January 21, 1991, but denied telling the public defender that he saw Hlinko and [petitioner] smoking marijuana at the gas station on October 19, 1988, or that he had been in a fight with Hlinko.

George Mainwaring, a Chicago Streets and Sanitation Department employee, testified that he worked on the southeast side of the city on October 24, 1988. On that day, he found a purse while emptying a trash can in the alley behind 9315 Chappel Street. He kept the purse and examined it when he returned home that afternoon.  He touched numerous items in the purse. Hoch's husband testified that the purse recovered by Mainwaring and its contents belonged to Hoch. Mainwaring delivered the purse to the police after recognizing Hoch's name, as well as her picture, on her driver's license. He accompanied police officers to the location where he found the purse. The address where the purse was found is less

than ten minutes from where Ilich lived, and five minutes from where Shane Miller lived. The police took Mainwaring's fingerprints and those of his partner.

Mary Leanne Grey, a forensic scientist and fingerprint expert with the Chicago police, testified that she found neither Mainwaring's nor his partner's prints on the purse or its contents. She found sixteen latent fingerprints and identified eight of them as belonging to Hoch, but she could not identify the other eight. She explained that the inability to find an individual's fingerprints on an item does not necessarily mean that the individual did not touch the item, but only that the individual left no suitable prints.

Dan Engelbrecht testified that he pulled into the Mobil station after 11 p.m. on October 19, 1988. He went inside looking for the attendant, and found no one in the mini-mart area. He opened the door to the back room and found Hoch lying on the floor, her head in a large pool of blood. He told another customer to call 911, and dragged Hoch's body into the mini-mart, where he had more room to perform CPR. He remained at the station for an hour, but did not notice Hoch's white van parked beside the building.

Stephen Lundy, the first police officer on the scene, testified that the crime was reported on the 911 emergency system at 11 p.m. Someone had obviously moved the body from the back room before he arrived. Soon after his arrival, other police officers blocked the driveway to the station in order to prevent anyone from entering. Although he found a .38 caliber shell casing in the back room, no suitable fingerprints were found on the casing. Similarly, the evidence technician who searched the station for prints could find no suitable lifts inside or

outside the station. The leader of the Illinois State Police northern diving unit testified that his unit searched the Cal-Sag River for the murder weapon, but did not find it.

Following stipulations, and the admission of exhibits into evidence, the prosecution rested.

Ilich's mother testified for the defense that on October 19, 1988, her family lived in Chicago. Her son's friend, Todd Hlinko, called her from jail on September 29, 1990. Hlinko told her he did not know whether [petitioner] killed Hoch, because he did not actually see it.

Tony Rodriguez testified that he and Manny Raices visited [petitioner]'s sister's house in Hammond after 8 p.m. on October 19, 1988. John Pullyblank drove with them but was passed out in the car for the couple of hours that they stayed in the house. [Petitioner], Hlinko, Hlinko's girlfriend Lisa Majszak, and Majszak's cousin Cory Majszak, were babysitting the sister's children. The sister had left her station wagon so that [petitioner] could give the Majszaks a ride home. Rodriguez saw John Miller's Cutlass 442 up on jacks in [petitioner]'s driveway earlier that day.

Rodriguez testified that he did not know that [petitioner]'s sister went out that night to celebrate her birthday, and did not know whether the night they babysat was, in fact, her birthday. The night they babysat could have been her birthday or could have been after her birthday. He acknowledged that a police investigator told him the actual date in question, but he was certain it was his payday, a Wednesday. He could not remember what he did on the subsequent

payday, October 26. He spoke to [petitioner]'s sister after Hlinko's and [petitioner]'s arrest, and at that time remembered visiting [petitioner]'s sister's house. Although he thought it "funny" that the police would charge his friend with the murder, Rodriguez decided not to tell the police about the possible alibi for [petitioner].

Laura Kobak, [petitioner]'s sister, testified that [petitioner] agreed to babysit on October 19, 1988, when she and her boyfriend Bill Nagy decided to go out on the spur of the moment to celebrate her birthday. [Petitioner], Hlinko, and Lisa and Cory Majszak arrived at about 6:20 p.m. Hlinko and [petitioner] were alone with the children when Kobak and Nagy returned around midnight. She mentioned the babysitting incident to no one prior to [petitioner]'s and Hlinko's arrest for murder in March 1989. Kobak spoke to Lisa Majszak about the night that Lisa and her cousin babysat, in order to assure herself that [petitioner] had an alibi for October 19, 1988. She talked briefly with Nagy about the coincidence of dates, but did not go to the police because someone told her it would do no good.

She testified that she saw Assistant State's Attorney Quinn's name in newspaper coverage of the investigation, and called someone who identified himself as Patrick Quinn. Because the person identifying himself as Quinn did not want to hear what she had to say, she did not tell him anything about the alibi. She did not request a meeting with Quinn because someone told her it was not worth the effort. Kobak talked to [petitioner] in March 1989 about the babysitting alibi. [Petitioner] remembered babysitting with Hlinko, Lisa, and Cory when she brought up the subject.

Howard Lindenbarker testified that he stopped at the Mobil station at 11:04 p.m. on October 19, 1988, and that the register tape recorded his purchase. He purchased his cigarettes with two one-dollar bills, and passed another male entering the station on his way out. He saw neither a blue Cutlass 442 with white stripes nor a white van, although he admitted that a white van could have been parked there. Michael Furtek testified that he paid for gasoline at the Mobil station with a ten-dollar bill, and could not remember seeing Lindenbarker or any other customer or vehicle while pumping his gas.

Kevin Kolcynski testified that he purchased cigarettes and a beverage at the gas mini-mart after 11 p.m. on October 19, 1988, parking his van directly in front of the station door while making his purchases. He did not notice a blue Cutlass 442 or a white van parked next to the building. The clock at his nearby house read 11:13 p.m. on his return, but he admitted that all the clocks in his house probably read different times. The police read to him a record of his purchases off the register tape, but did not read the time of purchase. He admitted he could have made his purchase at 10:59 p.m.

John Albert testified that he passed the Mobil station between 11:10 and 11:20 p.m. on October 19, 1988, looked toward the station, and saw neither a blue Cutlass 442 nor a white van. Trina Dorsey testified that she stopped at the red light outside the Mobil station after 11:01 p.m. on October 19, 1988. As her car moved from the stoplight, she noticed a light-blue Pontiac and a maroon car parked on the west side of the station. A white male stood pumping gas by the light blue car and one person sat inside it. She told the police that she did not see

the man very clearly and would not be able to identify him. She did not look inside the station. She did not see a crime being committed, a blue Cutlass 442, or a white van.

The court precluded the defense from presenting the testimony of Tim Anderson, an eleven-year-old psychiatric patient suffering from post-traumatic depression and stress due to sexual assault. Anderson had made a statement to the police regarding the armed robbery and murder. Anderson's statement, read at a sidebar outside the presence of the jury, said that in August 1988 he had sneaked out of his parents' home at around midnight. He went to an apartment, where he encountered three white males named Brandon, Brian, and Jay. Jay said, "Let's go get some money," whereupon they drove in Brandon's four-door sedan to the Mobil station. At the Mobil station, Jay took out a large, dark automatic handgun, cocked it, and went inside. Although the car windows were rolled up all the way and the stereo was loud, Anderson heard a single shot from inside the station that was so loud that he covered his ears. Jay returned, drove back to the apartment, and admitted killing a woman. Brian threatened to kill Anderson if he told anyone. Anderson remembered nothing else about that night, but he remembered that all the kids at school the next day were talking about the murder.

The prosecutors pointed out to the court that Anderson never claimed to have seen anything. They cited case law which permitted the court to exclude testimony concerning the possibility that someone else committed the crime, when the court considers the testimony too remote or speculative. Follow-up investigation into Anderson's statement revealed that, as far as the investigators

could tell, Jay did not exist. The Brandon and Brian about whom Anderson had spoken told police that the incident never happened, and that they had not even met Anderson until the summer of 1989. The defense countered that Anderson would testify as to October, not August, and that he would testify that Jay exited the station with two packages of cigarettes. The defense acknowledged that Anderson's original statement to the police said nothing about October or about cigarettes.

The prosecutors argued that Anderson's testimony introduced collateral issues of competency as to age and mental capacity, issues which would require appointment of counsel for the minor. Case law favored admission of testimony implicating a different accused only if evidence links the third party closely to the crime. Admission of Anderson's testimony would therefore require the State to prove, based on his statement and mental history, that Brian, Brandon, and Jay did not commit the crime. The defense responded that the prosecutors did not establish the irrelevance of Anderson's statement, which the defense described as plausible.

The court granted the State's motion *in limine* to exclude Anderson's testimony, on the grounds of competency, remoteness, and questionable references to time and date. Although the prosecutors had Anderson's original police statement for impeachment, the court ruled that the anticipated testimony by psychiatric experts regarding his competency would be collateral, and based its ruling in part on the collateral issue. The court claimed it made no holding as to Anderson's competence, but competency represented just one of the other

collateral matters that the court would have to address if it further considered allowing Anderson to testify. The court accepted Anderson's statement as an offer of proof, and the defense rested.

Cook County Sheriff's Police Investigator Donald Morrison testified as a prosecution rebuttal witness that he spoke with Rodriguez about visiting Kobak's house in October 1988, and that Rodriguez did not know the exact date of the visit. Rodriguez knew he went to Hammond on a Wednesday, because he was paid on Wednesdays. Rodriguez said nothing about Pullyblank's passing out in the car.

Cory and Lisa Majszak testified that they, [petitioner], and Hlinko babysat at Kobak's house only once, after October 23, 1988. Cory had a very close friendship with her cousin Lisa. Consequently, Cory remembered with certainty that Lisa and Hlinko went on their first date on October 23, 1988; the occasion was something that she kept track of. Cory remembered that on the night they babysat, Hlinko and Lisa had already started dating. Therefore, she testified, they babysat sometime after October 23, 1988. Lisa, too, remembered first going out with Hlinko on October 23, 1988, and that the date had special significance for her. She also remembered that she and Hlinko had already begun dating on the evening they babysat at Kobak's. Lisa and Cory did not see Pullyblank, Raices, or Rodriguez on the evening that they babysat with [petitioner] and Hlinko.

Lisa testified that she initially could not recall the exact date on which they babysat when she spoke to Investigator Morrison, but was certain that it was after October 23; she did not go to Kobak's house on October 19, 1988, because

she and Hlinko were not yet together on the 19th. Kobak called her a week before the trial, at which time she denied that she had offered information to Morrison.

During closing argument, the court sustained defense counsel's objection to the prosecutor's statement about Raices's failure to testify. The prosecutor pointed out that the nine defense witnesses failed to corroborate each other, and defense counsel failed to question Pullyblank about the alibi. The court overruled defense counsel's objection to the comment that their defense witnesses from the gas station did not see the white van, or even each other. The court also overruled the defense objection to the comment that defense counsel did not show the register tape time to Kevin Kolcynski because his confused time frame would have deflated the defense theory.

The jury found [petitioner] guilty of murder and armed robbery. It also found [petitioner] eligible for the death penalty, but found sufficient mitigating factors to preclude its imposition. The circuit court thereafter sentenced [petitioner] as previously indicated.

**The Appeals and Petitions Following Conviction**

On appeal the petitioner challenged the exclusion of Tim Anderson's testimony that someone other than petitioner murdered the victim and the prosecutor's conduct in shifting burdens of proof, misstating evidence, attacking defense counsel's integrity and relying on facts not in evidence. A divided court (2-1) rejected all grounds on appeal, but Makiel did win a remand to the trial court to address the issue of Anderson's competence as a witness and the relevance of his testimony. *People v. Makiel* 263 Ill.App.3d 54, 635 N.E.2d 941 (1994).

Petitioner sought leave to appeal the appellate ruling to the Supreme Court of Illinois, which was denied.

On remand the trial judge held a hearing at which Anderson recanted his earlier statements (made when he was eleven years old and receiving inpatient treatment at a psychiatric hospital) that he witnessed someone other than petitioner commit the murder.  Anderson's mother testified and there were stipulations concerning the testimony of police who investigated Anderson's claims and the statement of Anderson's psychiatrist.  The trial court believed that there was not sufficient evidence to determine the competence of Anderson at the time of the trial but that now, after a full hearing, the court found that Anderson was an 11-year-old psychiatric patient who first related his story to a doctor or counselor sometime in October 1990 and repeated it to police in November 1990.  The revelation coming about two years after the events of October 19, 1988 was motivated he said by his desire to strike out at former friends who mistreated him.  At the hospital in October - November 1990, Anderson was on psychotropic medication which he did not tolerate well.  In later testimony he said he did not remember much about his hospital stay except for what he told his psychiatrist.  His mother did not believe the story, nor did police and he recanted his claims in February 1995 and again when he testified under oath at the December 1996 hearing on remand. The trial court found the witness had a propensity to lie at an early age and concluded that Anderson was a competent witness in the 1996 remand hearing.  The judge concluded that the testimony Anderson could offer now would be "remote and speculative and, therefore, would not be relevant."  This conclusion was based upon Anderson's "not telling his story until two years after the event, that his story is totally uncorroborated, his propensity to lie at an early age, his motive to fabricate,

the fact that no one ever believed his story and his subsequent recantation of his story of the October 19, 1988 events involving his friend."

This conclusion of the circuit court was challenged on appeal and the appellate court upheld the convictions. The petition for leave to appeal was denied in October 1998. This was the last step in the process of direct appeal.

In mid-1995 petitioner's privately retained counsel filed a post-conviction petition under the Illinois statute. The petition was stayed pending the outcome of the direct appeal process. Further time passed while the petition was supplemented, the last supplement was made in April 2002. The prosecution asked for dismissal of the final petition. It was granted. Petitioner appealed this ruling and won a remand for a hearing on claims of ineffective assistance of counsel at both trial (failure to pursue defense testimony from Illich) and appeal (failure to challenge trial court's exclusion of reputation evidence and pending charges against a witness). The People's petition for leave to appeal was denied by the Illinois Supreme Court.

The hearing was held, evidence was heard and on April 4, 2008, the circuit court entered judgment denying the post-conviction petition after finding the claims of ineffective assistance of trial and appellate counsel were not proven. Appeal was taken and after extensive briefing the appellate court affirmed the denial of the post-conviction petition. The denial came in an order filed under Illinois Supreme Court Rule 23 barring it from being cited as precedent subject to limited exception.

Rule 23 orders usually fall into one of two classes: a short simple disposition of an easy case with no precedential value or a not very short disposition of a more complicated issue which depends on an analysis of the record in light of clear precedents about the meaning of which there is no dispute. The appellate court order is 24 pages long in typescript and consists,

properly so, of analysis of the record in light of clear rules of law.  The appellate court found that its "review of the record reveals that the evidence presented at the third-stage postconviction hearing supported the circuit court's conclusions."  Its conclusion was explained in several pages of analysis of the record in the case.

Petitioner sought and failed to get a rehearing in the appellate court and then sought and failed to receive leave to appeal to the supreme court.

This was not the end of the challenge to the judgment.  Petitioner followed a "knock on any and all doors" policy; a reasonable policy from the point of view of a person who is likely never to be freed from prison.

While the appeal of the denial of post-conviction relief was in process, petitioner sought leave to file a successive post-conviction petition alleging new evidence of trial counsel's ineffectiveness.  No court thought the evidence was new since it was a transcript or transcripts from the earlier trial of Illich and petitioner had not seen them.  The appellate court panel which, on September 28, 2011, had affirmed the denial of post-conviction relief also, on the same day, denied the claim of new evidence for a successive petition. "[The] bare allegation that [petitioner] did not see the transcripts before November 2008 does not suffice to show that an impediment prevented him from seeing the transcripts before he filed his initial postconviction petition."  Efforts to secure rehearing or leave to appeal also failed.

The final step taken by petitioner does not rest on claims about the trial or the verdict but challenges one aspect of the sentencing procedure.  At sentencing the trial judge noted that petitioner had "killed and attempted to kill."  It appears that in December of 2000, the Indiana attempt murder conviction was reversed and petitioner later pled guilty to a battery under Indiana law and received a sentence of eight years in prison.  The circuit court rejected the claim,

perhaps because the remedy is obscure (it is an equitable remedy only) and found in the code of civil procedure. It is apparently agreed that one way to petitioner's goal is for the Illinois Supreme Court to use its supervisory power to order that the claim be heard. The appellate court dismissed the appeal for failure to file a timely notice of appeal. Rehearing was sought and denied. Leave to appeal to the supreme court was denied as was the alternate claim that appeal in this case was a matter of right. That denial was issued on November 28, 2012. The mandate issued on January 2, 2013.

This clear path to the exhaustion of all state remedies is obscured by the last step the Illinois Supreme Court took in this case. The Court entered a supervisory order, to wit, "In the exercise of this Court's supervisory authority, the Appellate Court, First District, is directed to vacate its order in People v. Daniel Makiel, case No. 1-09-3430 (05/16/12). The appellate court is directed to hear defendant's appeal on the merits." That appeal is still pending in the appellate court.

The State of Illinois concedes that Makiel has exhausted his state court remedies. There is a small wrinkle that accompanies the concession. Petitioner has currently pending in state court a request for a remedy with respect to his sentence. It is an issue that cannot be raised in this court because the state courts have yet to decide the issue. Petitioner refers to the sentence as "unconstitutional" but his attorneys did not characterize the sentencing claim as constitutional in dimension. All they argued was that an equitable remedy does exist for persons who receive a sentence based, in part, on a prior conviction which is later overturned. The reason they did so is that there is no authority for the proposition that judicial consideration of a prior conviction at the time of sentencing is unconstitutional when the prior conviction is valid at the time sentence is passed. In this case a sentence was given at a time the attempt murder conviction was in effect in

Indiana.  It remained in effect for many years before it was reversed and, even after reversal,

several years passed before the petitioner sought resentencing.  In a case where the state

concedes exhaustion and there appears to be no constitutional claim about sentencing procedure

raised by petitioner in his current appeals (and such a constitutional claim seems to have no

precedent that would support it), I believe it is correct to proceed on the merits of the instant

petition.

### Exclusion of the confession of Tim Anderson

A trial court has the authority to decide whether to admit a confession of the crime

charged where that confession is made by a third person when that confession exculpates the

defendant on trial.  The issue before the court is whether the third party confession is reliable

enough for it to be admitted into evidence even when the third party has retracted or disavowed

the confession.  Obviously the problem is very unlikely (absent incompetency of a witness) to

arise in a case where the third party is willing to testify that he or she was the perpetrator.  The

leading case is *Chambers v. Mississippi,* 410 U.S. 284 (1973).[1]  The retracted confession can (or

should) be admitted when it was made under circumstances that provide "considerable

assurance" of its reliability by objective indicia of trustworthiness.  These conditions, the

appellate (and circuit) courts determined, were not met.

The confession was made two years after the crime occurred, it was uncorroborated and

one of Anderson's alleged companions in crime was not in town at the time of the shooting.

Several details of his confession were inconsistent with each other. Anderson did not himself see

---

[1] What led to a finding of admissibility in *Chambers* were the facts that the confession was made spontaneously to close acquaintances shortly after the homicide, then sworn to and corroborated, obviously against penal interest and available for cross-examination at trial.  In this case, the confession was made two years after the offense by an eleven year old child whose understanding that it might be against his penal interest is questionable.  There was no corroboration.  What was corroborated worked against admissibility since one of the perpetrators Anderson said was involved in the crime was neither known to Anderson nor present in the town at the time of the shooting.

or participate in the killing and so his statement was not against his own penal interest. The confession was made by a child under psychiatric care to one of his caretakers. Anderson testified, in recantation, that he told the story to get his former friends in trouble. It is true that Anderson could have been called to the stand and cross examined about his recantation but it was reasonable for the state court to decide that such an examination would not demonstrate objective indicia of trustworthiness.

Permitting the admission of the two-years-after-the-fact confession of an eleven-year-old psychiatric patient who did not witness the shooting in question and whose motivation was revenge on his former friends was not constitutionally required. Anderson was nine when the crime occurred and years later, several years later when he was in his middle or late teens, he gave a credible account for why he lied to his treater or treaters at the psychiatric facility. There are aspects of the state courts' resolutions of some of the contested issues that petitioner can and does argue were unreasonably resolved even in light of the broad discretion given to state courts. The determination that Anderson's childhood tales were not admissible is not one that can be fairly argued to be in violation of the petitioner's constitutional rights.

### The Prosecutor's Closing Argument

Closing arguments by both counsel are exercises in advocacy, the selection of specific details that make the opponent's contentions and arguments look unpersuasive. Closing arguments are often dramatic and phrased in ways that put the opponent in a bad light. The arguments are not nice but the law counts on the reason and experience of jurors to understand and reject over-the-top rhetoric. The prosecutor may not, as the appellate court said, exceed the boundaries of fairness and impartiality inherent in our system of adversary justice. The petitioner must show that it is "at least likely" that the complained-of comments caused the jury

to convict when it might otherwise have acquitted him. *Shaw v. DeRobertis*, 755 F.2d 1279, 1281 n.1 (7th Cir. 1985). The judgment whether this is so is made in light of the record as a whole. See generally *Darden v. Wainwright,* 477 U.S. 168 (1986).

The only issue presented in the habeas petition on which the appellate panel divided is the claim that the prosecution argument shifted the burden of proof and attacked the integrity of defense counsel. The appellate majority found (and, in my judgment, reasonably found) that the trial court did not abuse its discretion in overruling defense objections during closing argument "since the disputed comments arguably deal with matters introduced in the testimony of the witnesses." So, too, the majority found that the integrity of the defense counsel was not impugned by comments which "were meant to stress the strength of the prosecution's case in light of the testimony of corroborative witnesses." Lastly, the majority noted that "prosecutors may comment on the absence of testimony by an alibi witness whose name the defendant injected into the case as long as the prosecution does not rely on that failure to prove the offense." The majority relied on the premise that there is a significant difference between arguing that a defendant failed to prove innocence and arguing that the affirmative defense case was not relevant or credible. See *People v. Phillips,* 127 Ill. 2d 499, 538 N.E.2d 500 (1990). The majority noted that the prosecutor explicitly stated that defendant had no burden to put on a defense and argued, instead, that while some alibi witnesses were called, others who were friends of petitioner were not called even though they could have strengthened the alibi defense. The majority found that the prosecution did not make improper remarks and the trial judge was acting within his discretion to overrule objections.

The dissenting judge focused on the argument against alibi. In closing, the prosecutor said there were "nine people qualified" to support the defense alibi but three of them testified for

the prosecution, another three did testify for the defense which left three, two of whom were small children. There was one competent witness who could have corroborated the alibi but he was not called to testify. The dissenter wrote "the prosecutor misleadingly implied a far greater failure to present witnesses, apparently in the hope that with numerous witnesses giving lengthy testimony to inconsistent stories throughout trial, the jury would be unable to organize the precise evidence presented and would accept the prosecutor's implicit false assertion that many of the persons who defendant said he saw on the night of the murder were not called to testify.[2]

I do not conclude that a jury would be so easily misled. I also note that that the "nine people qualified" was a phrase that met a tactic used in the defense argument.

What the petitioner did in closing argument was to claim that Todd Hlinko had convinced other witnesses to lie by contradicting petitioner's alibi and to refer to unsworn hearsay (not in evidence) as telling the real story of the killing. The prosecutor was within his rights to point out that nine separate friends and family could have backed up petitioner's alibi but only three did so while three others testified against the alibi defense. The references to hearsay statements were attacked as being made by persons with a bias in favor of petitioner.[3]

The dissenting judge disagreed with the legitimacy of the prosecutor's argument that defense counsel tried to get Miller and Martin "to change their testimony." There was no evidence that defendant or counsel had contact with Miller regarding the case. Miller signed an affidavit inconsistent with his trial testimony at the behest of Hlinko's mother. Defense counsel did attempt to interview Martin and the prosecutor interpreted this as an attempt to get Martin to

---

[2] Another example that the dissenter cited was a prosecution argument that defendant should have asked a prosecution witness, one Pullyblank, about the alibi even though under the alibi as presented to the jury Pullyblank was passed out during the alibi period. Tony Rodriguez was one of the witnesses who supported the alibi. Rodriguez testified that he had driven to a home where petitioner was present and spoke to petitioner. Pullyblank was passed out in Rodriquez's car during this period. Pullyblank failed to remember the evening.
[3] The prosecutor referred to petitioner pressuring Hlinko to sign exculpating statements, to Hlinko's mother pressuring Shane Miller to recant and petitioner's investigator seeking recantation from Allen Martin.

change his testimony. There is no reason to assume that it is improper for the defense or defense counsel to test whether a witness is firm in his or her testimony. There were shifts in testimony by more than one participant in this case. Defense counsel and defendant are permitted, if they believe or suspect that a witness is lying, to persuade a witness to tell the truth, so long as this is done using legal means, i.e. no threats or bribery. The witness is under no obligation to meet with anyone who wishes to interview them or persuade them. That there were shifts in testimony was known to the jury in this case and there is no particular reason for a jury to conclude that the defense counsel (as opposed, perhaps, to Hlinko's mother) was doing something improper. Most attempts to get a witness to change testimony are, in fact, done in open court during cross-examination. To say that lawyers wanted a witness to change testimony is not an accusation of wrongdoing.

The appellate court reasonably concluded that questioning the believability of the offered defense and contrasting it to the strength of the prosecution's case is not an argument that petitioner should be convicted because he failed to prove he was innocent. Nor did the appellate court find that the defense counsel was improperly attacked. The defense did offer evidence and the prosecution can point to its shortcomings and gaps if they can be fairly said to exist. The defense offered an alibi, and two of the witnesses who could have supported his alibi instead denied the claim that they were with petitioner on the night of the crime. Finally the jury was instructed that statements in closing argument are not evidence. The finding of the absence of violation of constitution rights was not contrary to the constitution.

### The Effectiveness of Defense Counsel

The state courts considered the competency of counsel at both trial and appeal. The opinions in the state courts demonstrated reliance on *Strickland v. Washington,* 466 U.S. 668

(1984), and the standards it announced. A federal court deciding whether the state court properly applied *Strickland* must determine whether the state court's views in rejecting the claim of ineffective defense counsel were reasonable conclusions.

It is, usually, easy to allege ineffective assistance of counsel because defense counsel make decisions and the decisions did not lead to an acquittal. There is almost always evidence, witnesses and legal theories that defense counsel did not use. There is almost always an argument based on hindsight that can be constructed to show ineffective assistance of counsel.[4]

In this case, the state courts dealt with each of the actions of defense counsel that petitioner challenges. The first arises out of the erroneous ruling (at trial) that defense counsel could not impeach Allan Martin's testimony by bringing out Martin's pending forgery charge after Martin denied the existence of the pending charge. The appellate court found that proof that the charge was pending (as it was) would impeach Martin by showing that he lied on the stand and that the prosecution had leverage over Martin's conduct by having a pending charge against the witness. The appellate court held that the error was effectively harmless because Martin was effectively impeached on his denial that he had been drunk on the night of the murder, that he got in a fight with the other men that night and three times denied his identity when he spoke to petitioner's counsel. Further, Miller was impeached with the fact that he remained silent for several months during the investigation, and the fact that he had signed a statement for Hlinko's mother asserting that his statements inculpating Hlinko and petitioner were untrue. The appellate court (on post-conviction petition review) found:

> The record thus shows that the jury had been presented with other
>
> evidence which impeached Martin's testimony and would have caused

---

[4] In this case it is noteworthy that trial counsel and appellate counsel on direct appeal did far better than most defenders do. They managed to elicit a strong dissent on the merits of the claim that the conviction should be overturned.

the jury to question his veracity. Nevertheless the jury found the evidence sufficient to find guilt…beyond a reasonable doubt. Based on this record, appellate counsel reasonably could have determined that challenging the trial court's exclusion of Martin's pending charge would not have been a meritorious issue on appeal. [Petitioner] has not established that his conviction would have been reversed on appeal if counsel had raised this issue. He therefore has not met his burden of proof showing that he was prejudiced by counsel's failure to raise the issue on appeal.

It is hornbook law that failure to raise every non-frivolous claim is not a mark of bad lawyering since appellate counsel should select which claims among many possible ones will maximize the likelihood of success on appeal. *Smith v. Robbins.* 528 U.S. 259 (2000).

Both Martin and Shane Miller were called to corroborate Hlinko's testimony about some events after the crime, i.e. the disposal of the murder weapon and Miller's being told about the robbery while Miller was at petitioner's house. Miller testified that he was later picked up at petitioner's house by Brian Spodach. Spodach was called by the defense and testified that he never picked Miller up at petitioner's house.

Spodach was also asked to express his views about the community reputations of Miller and Martin for truthfulness and veracity. Upon objection by the prosecution the trial court refused to allow such testimony. It was stipulated at a state court post-conviction hearing that defense counsel had made an offer of proof that Spodach would testify that the two men, Miller and Martin, were liars and that was their reputation in their community. The state appellate court denied the ineffective assistance of appellate counsel on the grounds that trial counsel's offer of

proof was not evidence.  This is not so, as the State of Illinois concedes.  Petitioner was entitled to proceed <u>on appeal</u> based on the offer of proof.  One state court did decide the issue on its merits—the state post-conviction circuit court.  That decision is the one that counts in this case. See *Garth v. Davis,* 470 F.3d 702, 714 (7th Cir. 2006) (the relevant decision is the last state court to consider the merits).

At the post-conviction hearing, defense counsel relied on his offer of proof that Spodach would say, of both Miller and Martin, that they are persons who lie and this is their reputation.  Spodach would, under the rules of evidence, have been prohibited from expressing a personal opinion that another witness is a liar.  Testimony about community reputation may be admissible.  In any event the post-conviction court found that Martin and Miller were adequately attacked on credibility grounds previously noted above (p. 29).

Community reputation may be admissible but it is the weakest form of impeachment when offered from the mouth of a witness who was personally involved in the post-crime events of the evening and clearly possessed a personal (and inadmissible) opinion that Martin and Miller were liars.  There is nothing to indicate the basis for his opinion of <u>reputation</u> in the larger community. It was reasonable for appellate defense counsel to decide not to raise the rejection of the "witness is a liar" opinion evidence.  And it was reasonable for the post-conviction hearing judge to regard any error in this respect as harmless.

Other complaints were made about decisions of trial counsel.  One is that defense counsel did not call Sam Ilich as a witness.  In her testimony at a hearing, defense counsel testified that, prior to petitioner's trial, she had acquired the discovery from Ilich's case, attended the hearing on Ilich's motion to quash arrest and read the transcripts of his trial.  She did not deny that Ilich, if called as a defense witness, would have testified he knew nothing about the murder.  In fact,

Ilich had given a typed statement to Calument City police. That statement described his trip to the Mobil station with Hlinko and petitioner. Ilich stayed in the car and saw petitioner and Hlinko return to the car with cigarettes. Later he was present when they picked up Shane Miller and when they stopped to use a bathroom near the location where the victim's purse was discarded. Ilich claimed also to be present when he saw Hlinko throw what Hlinko said was a gun into the river. Basically defense counsel reasonably assessed that Ilich's written statement was much like Hlinko's testimony. Defense counsel could put Ilich on the stand to deny knowledge of a murder but doing so would open the door to impeachment of Ilich with his written statement which corroborates Hlinko's testimony. The state court found defense counsel to be credible on these matters. Even if I had the power to reject the state court's decision on credibility of a witness,[5] I would not do so in this case. There is no ground to justify a rejection of the state court's determination that defense counsel was truthful in this regard. Her testimony portrays a competent counsel making an appropriate investigation of a potential defense witness and reaching the reasonable conclusion that using Ilich opens the door to very damaging impeachment.

There are other complaints about the failure of defense counsel to call four witnesses at trial (Sherlock, Lee, Guziejka and O'Gara). These were witnesses associated with the Ilich case. The involvement of these witnesses was disclosed in the Ilich trial transcripts which petitioner's trial counsel read before petitioner's trial. There is no showing that petitioner asked to see these transcripts. This is a significant fact here because the issue of these four witnesses was not raised until petitioner sought leave to file a second successive post-conviction petition which requires approval from the state court. State law permits only one post-conviction petition as a matter of right. The appellate court denied the petition for a successive petition because he did not raise

---

[5] And I think I do not have the power to do so. *Murrell v. Frank,* 332 F.3d 1102 (7th Cir. 2003).

these specific (and not new) claims in the first petition. Claims that are waived or forfeited under state law are lost and the federal law does not accord the right to relief under § 2254 when petitioner has not exhausted his state remedies under available state procedures. There was a procedural default under state law.

There is a very narrow escape hatch but it does not work for petitioner. If "some objective factor external to the defense impeded efforts" to get his claims before state court, a petitioner might be able to proceed here. But petitioner claims he did not have the Ilich transcripts when he filed the post-conviction petition. The state courts found that there was no impediment to his obtaining the transcripts; his defense counsel reviewed them. Neither petitioner nor his post-conviction counsel asked for the transcripts. Absent denial of a request or demand for the transcripts there was no impediment to his making his late claims when he filed and litigated his first petition in state court.

Even if there was an impediment petitioner cannot demonstrate prejudice. What petitioner believes is that he might have prevented or overturned his conviction because these witnesses would have testified to prior inconsistent statements made by Martin and Miller. The showing that accompanies his claim for a second bite at the state court apple does not demonstrate that there is real force to his claim. These are not alibi witnesses of strength. One is Ilich's sister, another is Hlinko's mother and a third was Ilich's attorney. None of the three is a witness to the events of the murder. At best they are cumulative witnesses on issues of impeachment. None of them have stepped forward, and all these witnesses could offer was more impeachment of witnesses who, the state court reasonably found, had already been substantially impeached.

The limited role that these proposed witnesses could play precludes an argument that these witnesses would demonstrate that petitioner is "actually innocent" and therefore entitled to bring defaulted or untimely claims to the federal court. The "actual innocence" excusal of default requires that petitioner "demonstrate innocence so convincingly that no reasonable jury could convict." *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) These cases are uncommon and require a showing that actual innocence is probable. *Schlup v. Delo,* 513 U.S. 298 (1995). Most of the few cases that find such circumstances to exist involve scientific evidence of innocence like a DNA sample or false confessions.[6] Neither is a factor in this case.

There is no reason to overturn the state court determination that the proposed second post-conviction petition should not be permitted under state law.

**Issuance of a Certificate of Appealability**

The petitioner has pursued his claim that his constitutional rights were violated and, for various reasons, is entitled to a new trial.

This is understandable because his direct appeal of his trial and conviction for murder was not summarily lost, and no judge characterized the evidence as "overwhelming". Not all his claims were even summarily rejected by the majority. One judge on appeal clearly argued for and voted to reverse the conviction and retry the case. Very few appeals from criminal cases produce any dissent. As is common in cases where a three judge panel is not unanimous, the written opinions are long and detailed and require of each judge a prolonged course of deliberation and review. In this case the majority found flaws in the record and required further

---

[6] There was no confession by petitioner. He made two statements after being given Miranda warnings. In his statements he didn't admit committing any crime and denied knowing anything about the murder. His two statements were not consistent with each other and, when he was told what other witnesses had said, he remembered details that he had not previously given to the prosecutor. A jury could conclude that petitioner was withholding information and was doing so because he was involved in the murder. Petitioner does not challenge the admissibility of his statements in this habeas corpus petition. Nor did he challenge it in his post-conviction petition filed by his private counsel. This issue was raised on direct appeal and rejected by the appellate court majority.

hearings in the state trial court.  The post-appeal hearings and the pursuit of collateral remedies also produced detailed opinions.

A divided court encourages hope in the losing party and where there is hope litigation goes on.  Petitioner's lawyers wrote good petitions for leave to appeal adverse appellate court decisions, and judgments in collateral and post-trial petitions were appealed all the way to the final denial of leave to appeal.  All of this often encourages the losing prisoner to believe that there is a good chance to obtain relief from the sentence.  Yet the fact is that after the first appeal was heard and decided, there was never another divided court on the issues raised by petitioner.  He lost on all of them. The conviction stands after good briefing and competent defense work and careful review by experienced judges.  The result was, as the dissenter wrote, one on which reasonable judges could disagree but the majority ruled and there was no reversal, nor is there a colorable claim that the state courts' conclusions were unreasonable on their merits or arrived at in unreasonable ways.

When the dissenter wrote, he disagreed with the majority's ruling on the admissibility of the two statements petitioner made to a prosecutor.  That claim is not made here.  The dissenter and the majority were in agreement that a new hearing was required to determine the admissibility of Anderson's statements.  That hearing was held and no judge dissented from the finding that Anderson's statements were not admissible.

In the end the dissenting judge concluded that "In light of the closely balanced evidence, I cannot say that the prosecutor's remarks did not tip the balance in the State's favor.  I would find the remarks another basis for reversal for retrial."

It may be problematic to infer that the dissenting judge was of the opinion that the prosecutor's argument standing alone would require a new trial.  Leaving aside the issue of the

admissibility of Anderson's statement to a mental health professional, an issue on which there was no dissent, the other error which the dissenter found was the admission of the statements petitioner made to an Assistant State's Attorney. That claimed error is not, and could now not be, relied upon as grounds for issuance of the writ of habeas corpus.

Yet I do interpret the dissent to reach the conclusion that the evidence including the statements to the prosecutor was "closely balanced" and to conclude that improper arguments are, standing alone, another basis for reversal for retrial.

I find that with respect to the claim of improper closing argument, a jurist of reason would find it debatable whether petitioner has alleged one meritorious claim, and that petitioner's claim satisfied the procedural requisites for making that claim.

I grant a certificate of appealability on the issue of improper closing argument.

The petition for a writ of habeas corpus is denied.


ENTER:

James B. Zagel
United States District Judge

DATE: August 27, 2013